The United States Court of Appeals for the Federal Circuit now open in session. God save the United States and this honorable court. Thank you. Please be seated. We'll hear argument first in number 2010-1230, Boston Scientific v. Johnson & Johnson. Mr. Pritikin, when you're ready. May it please the court. I'm going to start with written description and then I'll turn to enablement a little later in the argument. The district court made three fundamental but related errors of law that require that the case be remanded for trial. And I want to summarize what I think those three key errors are. And then we'll come back to them in a bit more detail. First, the district court failed to recognize that where a well-known class of compounds is claimed as part of a combination claim. And where the discovery of that class of compounds is not the inventive contribution, there is no need to include a detailed description of the members of the class. And indeed here the district court went even further and ruled, contrary to Ariadne, that without examples the patents are invalid. Your general rule was there's no need to include a detailed description of the members of the class. I would guess that even counsel for Boston Scientific wouldn't probably disagree with such a broad statement. But here there were no members of the class disclosed. That's different from not describing all the members, describing none. So what about when you describe none? Is that really? A couple of responses to that, your honor. First, there is a member of the class that's described and that's rapamycin. Well, but the term is rapamycin analogs. So rapamycin is not an analog to itself. So I don't think there is any analogs. There's not an analog. I'll agree with you on that, your honor. But rapamycin itself was well known, well defined, and well characterized. And that's very important. In fact, the binding properties of rapamycin were very well known, very well understood at the time. The parts of the molecule that were responsible for the binding to the receptor were well known. It provides a good deal of structural information. And if we look at this court's precedent, if we look at Ariadne and we look at other cases, examples are not necessary where there is a known correlation between structure and function in the literature. The court has said that many times. And there was a good deal of evidence in the record here as to that correlation between structure and function. Dr. Sabatini's declaration laid that out in great detail. The correlation, just so I understand it, you're referring to the binding of the FKBP12 on the one side and the mTOR thing. Basically, this picture in your brief, is this the correlation that you're referring to? That's a simplification. This mechanism of operation? Yes, that illustration is a simplification of it. But if you actually look at the articles that predate the 1997 patents that are cited here, you'll see that the binding was very well understood. And that was indeed the method of action, binding to FKBP12 and then to mTOR. It was also known that it was that large macrocyclic ring that was responsible for that binding. And so is your argument then that one of skill in the art would know that you don't mess with the macrocyclic ring, you don't mess with the triene, you don't mess with this other part. I don't remember what it's called. What is it called? Lactone. Thank you. You don't mess with those things. You only mess with the little O's and H's sticking off the sides. And that's how you'll find, collectively, your analogs that are most likely to operate in a similar fashion. Is that the argument, as I understand it? That's in Dr. Sabatini's declaration. Yes, Your Honor, that's what he said. So let me come back to what I think the three errors are. That was the first error, was the failure to recognize that where there is a well-known class, and that is not the inventive contribution. We're not saying that the invention here was the discovery that rapamycin or rapamycin analogs could be used to inhibit restenosis. It's in the prior art. It is the use of that, in a sense, a drug delivery device that is claimed here. The second fundamental error that the court made was that, contrary to Ariad, the court ignored the extensive factual record as to the nature of the invention, the existing knowledge in the field, and the prior art. All of these things that are in Dr. Sabatini's declaration, the sorts of things we just talked about— Are we talking only, just so I know, about six? Are you talking about the 1997 patents or the 662? Or is your belief that these three errors apply to all four? I think they apply to all, Your Honor. And I think it's a fortiori with respect to the 662 patent. And so the focus has been on what is in the literature by 1997, because once you have that, a fortiori, I think you have sufficient information for purposes. Well, but the 662 differs from the 1997 in that the 662 seems to claim a subgenus when the only thing disclosed is a genus. And so that seems to me a little different than the 1997 situation, where the 1997 claims arguably exactly what you argue you've disclosed verbatim, word for word. That's at least my understanding of the difference. Is that not accurate? I don't think that's right, Your Honor. I think that the macrocyclic triene analogs are the same as the analogs that are disclosed and referenced in the patent specification. Well, let's look at the 662, and why don't you show me where that is? Because as I understand it, what's claimed in the 662 is the macrocyclic triene analogs, but the only disclosure I see is a genus of analogs of rapamycin, which I'm sure you'll agree could include things that are not macrocyclic triene. I don't think so, Your Honor. Sure you could. An analog of rapamycin. Certainly, a chemist would say an analog of rapamycin is a single change to the lactone or a single change to the triene. That would still qualify as an analog of rapamycin, wouldn't it? I think there are two points on that, Your Honor. First, I don't think there really is anything in the record here that would differentiate the macrocyclic triene analog from a larger group of analogs. First point, I don't think there's anything in the record on it. Second, that argument was advanced on appeal by Boston Scientific. It was not advanced to the district court. That argument was waived because it was not made in the district court. It was raised for the very first time. Well, let's address it just for present purposes as though it's not waived. I understand your argument, though. So why do you think it would be exactly the same? I mean, did you appreciate what I mentioned? And am I correct from a chemical standpoint? Wouldn't a single change in the triene still technically be an analog to rapamycin? I think the answer to that, Your Honor, is you have to go back to the declaration of Dr. Sabatini and other things that are on the record on this. And what Dr. Sabatini explained in his declaration was that a person of skill would have understood and appreciated that the macrocyclic ring was the critical piece in the binding to FKBP12 and to mTOR. One would have known that you don't want to make changes to that. I think in light of that testimony, I don't think that the words macrocyclic triene really add anything to the larger class of analogs to rapamycin. Those would be issues that could be explored later. They could be explored in connection with the trial in the case. But on this record, I don't think there really is a basis for differentiating those two. You had a third point that you wanted to raise in your summary. And if you could make that, I have a question about your first point. The third point, and these are interrelated. The third point was that the court treated the class of rapamycin compounds as if it were defined only by function. So you can read through Judge Robinson's opinion, and repeatedly she is making statements that it is defined only by function. And the problem with that is, first, there is a requirement that there be structural similarity to a single well-known and well-understood molecule. And second, the court, as I said earlier, ignored all of the evidence that was in the record on the correlation between structure and function. It's just nowhere to be found in the district court's opinion. Let me ask you, you said in your first point that the critical errors that the court was applying, the kind of analysis you would apply to, for example, a compound, a claim to a compound, to a combination. Now, is it your contention that if, for example, the first claim of the 3286 patent had read a stent having a coating applied thereto, wherein said coating comprises a biocompatible polymer drug mixture, and said drug is, now substitute, a therapeutic substance, that that would be a patentable subject matter in the 1997 patents? I think you'd be implicating other issues there, Your Honor, the issues of obviousness and other things that certainly would arise there. My point is, isn't that subject matter that had already been invented? And the claims, there are claims in these patents, Your Honor, that cover subject matter that is a novel combination. Well, I'm trying to get at the question of whether this really is a combination in the sense that I think you were using the term, in that we don't have to worry about the rapamycin. We have an invention here as to which rapamycin simply is incidental almost. Or whether this is a case in which it, sure, it's a combination, but the critical and central core contribution is the discovery that, you know, rapamycin can be used in this way for this purpose, rapamycin and its analogs. I don't think so, Your Honor, because the utility of rapamycin to inhibit restenosis is in the prior art, and we're not making any bones about that. That had been explored, it had been published, it was in the literature, rapamycin and its analogs. If you read the summary judgment ruling on obviousness, you can, that issue is not before this court, and you're only kind of getting a glimpse of it by looking at what Judge Robinson wrote. But it sort of backs in by virtue of the argument you're making on combination. In other words, if I were to say, for example, that my invention is a particular compound and all of its similar compounds, all similar compounds, that is used as a coating on a pill to make the pill bioavailable over an extended period of time in the system, I don't think that I would be able to avoid the kind of written description analysis that we use with respect to the substance, simply by having tied the substance to a very well-known kind of combination use. Would I? Hear what you hear. Well, let's deal with the hypothetical. How would you deal with that? Would you say that's an entirely different analytical line from the line that you would employ if you said, I claim a preamble for purposes of use in a pill coating, and I claim the following compound and all of its analogs? I mean, to be clear, we're not saying that you avoid the written description analysis. But you are suggesting you do a different kind of written description analysis as I read your brief. I think what we're saying… Less rigorous analysis, in fact. Well, we're happy with either one, because I think there are fact questions that are there any way you look at this. But the invention here, under Ariadne, you have to look at the nature of the invention. That is the starting point. And the question is, what is the inventive contribution? There's no discussion of that in the district court opinion. The discovery that rapamycin and its analogs could be used to inhibit restenosis is not the inventive contribution. What is the inventive contribution? Again, this is alluded to in the district court's ruling on obviousness. But the discovery that a non-erodible polymer, the chloropolymers, the acrylate-based polymers had exceptional benefits. You kept saying, well-known, well-known, well-known. But this patent doesn't discuss these concepts at all. And it certainly doesn't indicate that they're well-known. In fact, it actually kind of indicates the contrary. I mean, doesn't this patent… And by this, I'm talking about the 7286. I used the 7 because there's two 286s. The exact hormonal and cellular processes promoting restenosis are still being determined. The exact mechanism for restenosis is still under active investigation. The mechanisms for most agents employed are still unclear. The ideal agent for restenosis has not been identified. The precise mechanism of rapamycin is still under active investigation. All of that suggests the opposite of what your expert is saying, that one of skill in the art would know the binding site to FKB-12, PP-12, and mTOR and all of that. I would direct the court's attention to the Poon article that is cited in the 1997 patents. It's an important piece of literature. It is referenced in the Sabatini Declaration. And it explains the mechanism of action, the binding to FKB-P12 and mTOR. I do. I agree. It does. But you don't cite the Poon article with reference to that. You don't say in the patent anything about C. Poon. I mean, it is cited. But your assertion in the patent is that this stuff is still under active investigation and not yet determined and isn't precise yet. And I agree. You reference Poon in passing, but not for this purpose. And I'm wondering how much of that is imported in in light of that. Well, I think Ariad tells us that we have to look at what is known to people working in the field. Well-known, which is why you kept repeating the well part. It is. But, again, I would direct the court to Sabatini's declaration. These are fact issues. He said these are well-known. He used the adverb well in reference to it. And it's not conclusory. He cites specifically to the articles the kinds of things that people working in the field would be looking at. I see that my 10 minutes is almost over. Let me ask you a question about enablement. Yes. Let's not leave that one behind. The aspects of enablement in the 97 combination patents, isn't there a requirement to do additional testing, an additional pursuit of trying to figure out what the combination of the reprobation really is, in addition to the stents? Well, the court formulated the enablement issue, and it's in footnote 31 in A30, very narrowly. And the court said the issue that she was considering was merely the issue on the amount of experimentation to select the analogs to use. And what that backs us into are assays and tests to select them. So the question is whether a person of skill in the art, whether this is within the common knowledge of people who work in the field, the selection of the assays that would be used. And again, Dr. Sabatini lays them out. I can direct the court chapter and verse to the assays that would be within the common knowledge of people working in the field. Those common knowledge are well known. Those interchangeable language. I believe they are, Your Honor. I think it's sufficient to raise a fact issue for trial on this, that those are the sorts of things that a jury would be entitled to consider. Boston could argue the opposite, but we've presented the evidence that these assays were within the common knowledge of people working in the field. With respect to the 662 patent, Judge Robinson was determinative that the written description was not met in 662. There was also a motion for assembly judgment on enablement for 662. In footnote 41, she considered that but not rely on enablement. Hypothetically, can we rely on enablement at this point? Here? Yes. Well, it is an issue of law. I would think that the better course on if the court were to reach that issue would be to remand it to the district court. I understand that would be your position. Can we rely on it? Can you rely on it? The court can rely as a matter of law on alternative grounds to affirm a judgment. Your thought? Sure. We will reserve rebuttal time for you. This is on our ticket. All right. So don't worry about the red light. Let me ask you to make sure I understand just how, well, for lack of a better term, how broad your argument is with respect to written description. Suppose that the patents each had claimed not rapamycin and analogs, but rather it said rapamycin and other organic compounds having the same effect. Would those claims be invalid in your view? You know, the hypotheticals are difficult, Your Honor, but the key difference here is the structural similarity to a single molecule. On indefiniteness, the court ruled that these claims were definite because it was tied to the structural similarity to one specific molecule. And that provides- Okay. In my claim, having similar function because of pertinent structural similarity, i.e., really saying if it has the same function, it probably has the same, roughly, in all important respects, the same structure. Would that be okay? Would that be a legitimate way to claim such that anything that worked would be within the scope of your patent? I'd be very skeptical of a claim written that way. And what would be the flaw with it? Would it be written description or enablement or what? Indefiniteness? I think it would probably be- Well, first, it might be an indefiniteness issue. I don't know. It would depend on the record. I think from the standpoint of written description, it would depend on the record that is there. I'd be skeptical of that, but it's not at all what we have here because while one cannot claim purely by function, and that's where Judge Robinson's focus was, what this court recognized in Ariad is that there are a lot of different ways that one can satisfy the written description requirement, partial structure or a known correlation between structure and function. And that was the piece of it. I think that's where she went astray was ignoring that piece of it. Very well. We will reserve your full rebuttal time, Your Honor, because we questioned you extensively. And we'll hear next from Mr. Wolf. Thank you, Your Honor. May it please the court. In the blue brief at page 21, the court has stated in order to prevent a copyist from easily avoiding the claimed invention by selecting a known analog of rapamycin with the same biological activity, the inventors also stated that structural analogs, the parent macrocyclic lactones, closed parent of rapamycin, could be used instead of rapamycin as pharmacologic agents in the stents of the invention. Respectfully, that statement is incorrect. The only mention in the specification of analogs of rapamycin is not a prophetic belief that such analogs would work. There is no statement that we believe because they're similar, they'll work. There's no statement that they hope they work, they might work, we prophecy they'll work. The only mention of analogs is in a laundry list of potential experiments. We start with possible agents. Rapamycin is one. Macrocyclic lactone analogs is number two. And then even more broadly, inhibitors of cell cycle progression. Those are your potential agents to experiment upon. Well, what about the cottons prior art reference? We have a prior art reference that discloses 25 macrocyclic analogs that arguably would be a starting point for one of skill in the art to turn to. So if those 25, for example, are in fact well known based on cottons or otherwise, there's at least a question of fact over whether they are. Isn't that enough of a starting point to satisfy a written description? Assuming for the moment they're well known, and I don't believe, I think the lack of any discussion in the specification is pretty good evidence in the quotes Your Honor read suggesting. Well, but it's a question of fact. More importantly, Your Honor, there's no dispute that in the cottons reference, there was no evidence that these analogs would treat restenosis in a Petri dish. So you're saying there's no evidence they would bind to FKBP12, for example? They didn't suggest in any way. They were looking at the immunosuppressive effects. This all started with not rapamycin, but tacrolimus. And it's an interesting structure. Your Honor hinted at it with another way to phrase the claim. Tacrolimus is really the parent compact here. It was subsequent to recognizing that tacrolimus had these interesting immunosuppressive effects. And someone said, aha, let's take another look at rapamycin. And so they were looking hand-in-hand at these two drugs. Someone said, let's look at them for restenosis. Interestingly, tacrolimus, the first of the drugs looked at for these purposes, and a macrocyclic lactone analog, one that bound FKBP12, didn't work for the claimed purpose. It did not work. The very first analog they looked at failed. Well, but that doesn't mean you failed written description, right? Written description is allowed to be a trial and error sometimes or enablement. Isn't it? Well, the fundamental question for written description, at least I understand it is, did the inventors possess the invention? Is this something they invented? Far from claiming they invented it, they said the opposite. We're going to leave it to someone else to do the experiment to see whether they can invent it, whether they can figure out whether this works. So we have the agents, and then we have both erodible and non-erodible polymers, a whole laundry list of polymers. Interestingly, in the brief, and it's not terribly relevant to today's discussion, but there's a suggestion that the inventors somehow landed upon the right polymer as well. That's not in the specification either. They list both kinds of polymers to be experimented upon. But isn't that more of an enabling issue rather than written description? It's both, Your Honor. It is both, because for written description, the question is, did they invent this? Did they possess the invention at the time that the application was filed? And they could not have more clearly said, we haven't possessed it. We're suggesting you go experiment to figure out whether you can possess it. Well, if you have to continue the experimentation, that's an enablement. Absolutely, and there's a continuum here, Your Honor, and I've described it to some of my associates as a Venn diagram where there are some issues that are written description, some that are enablement, and some that clearly overlap. I would say this is a case that clearly overlaps. And when you have a circumstance where in 1997 the inventors say, let's try this experiment on any number of chemicals, not just analogs, but anything that might work, any number of polymers in stents, not on stents, administered orally, et cetera, let's see what works. Well, you're showing simultaneously that you haven't possessed it at the time and that it would take undue experimentation to get to an invention. And remember, Your Honor, it wasn't until nine years later that they claimed this class of analogs in the claims. It wasn't until Geind announced it. Macrocyclic triene. That didn't come along until nine years later. That's what you're talking about. Macrocyclic lactones. Both, Your Honor. The answer is both. Well, but it was disclosed in the specification of the 7286 patent. I mean, it expressly says, agents, column 6, line 4, rapamycin, and then a parenthetical, sirolimus, and then structural analogs, and then a parenthetical, macrocyclic lactones. So why isn't that, in fact, demonstrating possession? It expressly say those words. It's not nine years later when they added the claims. Those exact words that are in those claims added nine years later were in the specification as filed. Your Honor, it depends what words surround it. I mean, they could have said, we think this will work or we've proven this will work, macrocyclic lactones, in which case I think they would have a pretty good argument on written description. Alternatively, if they had said, we don't believe this will work, I think that would clearly disprove that they had this possession. Here, the relevant word is just above the sentence you just read or the fragment you just read, experiments. They weren't claiming that they had possession of it. They weren't claiming that they thought it might work. They were saying, let's work on it. Let's see what happens. Again, I'm reading into the word experiments. Frankly, I'm putting a gloss on this. It's a little, it's at best ambiguous what this means, but the best case scenario for Cordis in this case is that they were thinking that someday they might try to figure it out. And importantly, Your Honor, below this list, this laundry list of agents, of delivery mechanisms, of polymers, et cetera, there were actually four specific experiments laid out. And the only one that's relevant to this case is a rapamycin-only experiment. So they put out the laundry list and they're saying, we haven't even yet done an experiment with rapamycin, let alone any of the analogs of rapamycin. Going to the question of the pertinence of the fact that this is a combination as opposed to a claim to the compound alone, if I were to invent a new form of automobile engine, I give you all the components of this engine. It's radically new. It operates in a way very different from an internal combustion engine, but it runs on fuel. And what I say is, here are the components of the engine. And you will use fuel, which will be blackstrap molasses or some similar substance. Would that be invalid for failure to describe with sufficient specificity the fuel? Your Honor, I think this is what Herschler was trying to get at when he used the word auxiliary. And you were getting at with what's the inventive aspect of the claim. To put it in a colloquial term, if the court will forgive me, we may cut the patent prosecutor a break when we all recognize that what's inventive here is X and Y is just explaining a little bit more about X or is auxiliary to X. In proper prosecution practice, they probably should have phrased it a different way. But nonetheless, Herschler said, we'll cut him a break if it's auxiliary. But here, where the patent says, and this is at 348 to 50, the conventional approach has been to incorporate the therapeutic agent into a polymer material, which is then coated on the stent. When that's the conventional approach, no one can argue that the identification of the therapeutic agent is auxiliary. If there is an invention here, and of course the Patent Office is currently taking the position that there is no invention here. But if there is an invention here, it clearly has to be in the identification of the therapeutic agent. And then we're squarely in the realm of Carnegie Mellon. Carnegie Mellon deals with this issue precisely. And I think unambiguously. I leave it to the court to decide whether Herschler is good law. I would note for the record that Futterer is not binding precedent despite Cordes' reliance on it. But Herschler, if it is good law, it only applies in the narrow context or auxiliary. Look. Yeah, I'm puzzled. Why do you think Futterer is not? At least the way I read it, Your Honor, it was a five-judge panel. Two wrote the opinion. Two dissented. And the fifth joined in the result only, not in the reasoning. Oh, I see. I see. I thought. Okay, I'm fine. I'm sorry if I wasn't clear, Your Honor. That's fine. Your Honor, I'd like to go back briefly to your discussion of the 662 patent. And you asked about the subgenus, and I believe you're absolutely right. As to the subgenus, there's a second important distinction in addition to the subgenus argument, which is that the 662 calls out dosing ranges and results. So it's demanding even more than the 1997 patents do. The 1997 patents just say you have to. So you're saying it's more difficult to find an analog that will actually work with those exact number of grams and everything else. It makes the needle even a bigger haystack or actually same-sized haystack, smaller needle. I don't know. Whatever the analogy is. I would suggest both, Your Honor, a very small needle and a very large haystack. I want to address briefly the waiver issue because I think this is fatal to the 662 claims. As a matter of civil procedure, a party winning on summary judgment can't waive. We only bring, by definition, a limited number of issues to the court's attention at summary judgment. And if we win, that ends the case. Can't you waive for purposes of appeal, having us affirm an appeal on an alternate ground that wasn't presented at all below? When you make a summary judgment motion, we can't, on appeal, grant you summary judgment on a ground that you never moved for, for example. On an issue of law or on a summary judgment perspective, based on this record, the court finds that it can find in the same way you can affirm an alternative ground. If you want to phrase it as an alternative ground for review, but we haven't waived anything. If they want to argue there were fact issues below that were undeveloped, they're free to argue that. If they want to do the appellate equivalent of a 56th motion, they're free to do that. But this court is perfectly at liberty to say an alternative basis to the written description is this subgenus argument. And there really is no dispute. Your Honor, in the dissent in the 318 patent infringement litigation, you wrote one sentence that I think is the key to this argument, both in terms of written description and enablement. As a result, the proper focus when assessing enablement is on what is disclosed in the patent, not what is taught in the prior art. And that's exactly right. And that's what we have here. You can see on its face within the four corners of the patent. What were you reading from? His Honor's dissent in the 318 patent infringement litigation, which is at 583 F1317. That was a good sentence. We were fond of it. But it was dissent. I don't believe the majority disagreed with the sentiment, and I can quote the string site you were relying upon right after that. Unless there are any further questions, I believe the court has our arguments well in mind. Very well. Thank you, Your Honor. Thank you. Mr. Pritikin, we'll give you your rebuttal time. Let me start with Herschler, Your Honor, and the question of what the inventive contribution was here. Mr. Wolf said that it was not in the selection of the polymers. But again, I would direct the court's attention to the obviousness portion of Judge Robinson's summary judgment ruling. The evidence that was presented was that the non-erodible polymer, the floral polymers, the acrylate polymers, that that was an important part of the inventive contribution here because these polymers were thought to have inflammatory effects. And the conventional thinking in 1997 was that you would want to use a degradable polymer or something that would disappear. The inventive contribution was not the discovery that rapamycin or rapamycin analogs could be used to treat restenosis. Now, there are a number of other points that Mr. Wolf made that I want to respond to, and many of them concern factual points that are in the record here. And, for example, one of the statements that was made was that the Cotton's patent discloses that the rapamycin and the analogs could be used for immunosuppression, not for restenosis. But also in the record here is the Skotnicki patent, another very important piece of prior art that would have been known to people working in the field at the time. And the Skotnicki patent points out correctly, as people appreciated at the time, that once you knew what these biological effects were, that the rapamycin analog would work for immunosuppression, it's precisely the same for restenosis. And it says, one can read it, it says that because of the effects of these analogs in the assays that were used, one would appreciate they could be used to treat restenosis as well. There are many detailed factual issues of that kind that really don't lend themselves to broad generalizations or the kinds of sweeping conclusions that the district court reached here. Another of the points that I do want to respond to briefly was the statement that was made by Mr. Wolfe about this compound, tacrolimus. I mean, again, I don't know that this has any bearing on the issues that the court has to deal with here. But the literature will show at the time that tacrolimus did not bind to mTOR. It doesn't. And so a person of skill by 1997 would have known that that was not a suitable compound to use in the claimed combination. Can I take you back to a point you were making earlier? I just want to make sure. This may be somewhat peripheral, but I'm not sure. You were focusing on the polymer as being a core element of the inventive contribution here. And yet, for example, the 3286 patent claim one just refers to the polymer as a biocompatible polymer. So there's no invention there, is there? I mean, what's... Is this claim, as you're now characterizing the inventive contribution, invalid because it doesn't recite the inventive contribution? There are a lot of claims in these various patents, Your Honor. And the ones that I would direct the court to focus on are the narrower claims, the claims... It's very common to have broader claims and narrower claims. The narrower claims are the ones that are really the most important and that ought to be front and center here. And when you read through these patents, you'll see that there are claims that are really quite focused to the non-degradable fluoropolymers, to the acrylate-based polymers. There are claims that also spell out the elution patterns over several weeks. There are a combination of things there. And, you know, one could point to the broader claims, and, you know, I suppose we could debate what they are, but the claims that we're really concerned about here are the narrower claims. Understood. So let me come back for just a moment, then, to really the larger issue here, apart from Herschler, and that's the question of whether there are fact issues that are presented. And, again, this came up on summary judgment. We were entitled to the benefit of all reasonable inferences. And the central error, I think, that Judge Robinson made here both on written description and on enablement was really a refusal to look beyond the four corners of the specification and to consider what was known to people working in the field and was known in the prior art. I think part of the problem was that the focus was on cases like Lilly and others, cases, patents that came out of a research setting, very early research in universities, where what was in the prior art was really quite scant, and the focus in those cases was not on what was known to people working in the field. What we have here is a later industrial application of research that was known and that was published. And I would submit that had the court looked at and considered what is presented in the Sabatini Declaration about what was known to people working in the field,  that we were entitled to a trial. I will. Thank you, Mr. Chairman. Thank you. Thank you, Your Honor. Case is submitted.